Filed 7/21/26  Chowdhry v. Tissera CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| USMAN CHOWDHRY,<br><br>　　Plaintiff and Respondent,<br><br>　　　v.<br><br>FRANZ GERALD ANDRE TISSERA et al.,<br><br>　　Defendants and Appellants. | G065191<br><br>(Super. Ct. No. 30-2022-01258301)<br><br>O P I N I O N |

　　　　　Appeal from a judgment of the Superior Court of Orange County, Sandy N. Leal, Judge. Affirmed in part, and reversed in part.

　　　　　Rhonda Walker for Defendants and Appellants.

　　　　　C&K Law Group, Kiarash Jafari and Christopher K. Jafari for Plaintiff and Respondent.

In this dispute arising from plaintiff Usman Chowdhry's purchase of a rare Japanese import vehicle, a jury awarded him a total of approximately $400,000 in damages, including $150,000 in punitive damages. Defendants Franz Gerald Andre Tissera, Frederick Tissera,[1] and Phase9MotorSports, Inc. (Phase9) (collectively, defendants) appeal from the ensuing judgment entered after the trial court found Franz and Frederick to be the alter egos of Phase9 and denied their motions for a judgment notwithstanding the verdict (JNOV) and new trial. They contend a new trial is required because the jury's special verdict vis-à-vis damages is legally invalid. In addition, they argue there is insufficient evidence to support any award of punitive damages and the court's alter ego findings. We conclude defendants forfeited the challenge to the alleged inconsistent special verdict and waived their argument concerning the alter ego findings. However, because there is insufficient evidence to support any punitive damage award to Chowdhry due to, inter alia, an absence of evidence concerning defendants' debts and liabilities at the time of trial, we reverse all punitive damages portions of the judgment. We otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

INITIATION OF THE LITIGATION

Chowdhry met Franz and Frederick through a mutual friend. Franz, who had been in the automotive industry for some time, owned a vehicle import company, Phase9, which focused on the sourcing, procurement, and importing of certain Japanese domestic market vehicles. After a few discussions with Franz and Frederick, Chowdhry began

---

[1] Because Franz and Frederick share a last name, we refer to them by first name for clarity. No disrespect is intended.

2

expressing an interest in potentially purchasing an imported Japanese vehicle.

After Chowdhry paid more than $430,000, a car was imported, and Chowdhry took possession of it, Chowdhry sued Franz, Franz's siblings, Angela Chisholm and Frederick, as well as Phase9. Among the claims alleged in the complaint were breach of contract and the implied covenant of good faith and fair dealing, fraud, negligence, conversion, violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), and violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.; CLRA.) In addition to general, compensatory, and special damages, as well as statutory penalties, the complaint prayed for punitive damages.[2]

## II.

## TRIAL

The matter was tried to a jury, with testimony coming from Chowdhry, Franz, Frederick, Chisholm, and a person who was retained by Chowdhry to opine on the value of the imported vehicle.

A. *Chowdhry's testimony*

Chowdhry testified that after meeting Franz and Frederick, hearing about their business, and confirming they were importing a certain rare Japanese car for a mutual acquaintance, Chowdhry expressed interest in purchasing and importing from Japan "'[w]hatever is one that can be had today in the U.S.'" He explained at trial that he meant he wanted a vehicle that could be registered and driven once received. In response, Franz

---

[2] Defendants filed a cross-complaint against Chowdhry. However, pursuant to a stipulation of the parties before closing arguments at trial, the cross-complaint was dismissed and Chisholm was dismissed as a defendant in the case brought by Chowdhry.

mentioned two cars: a midnight purple 1999 Nissan Skyline GT-R V-Spec (V-Spec), which was the type being imported for the mutual acquaintance; and a 2002 Nissan Skyline GT-R M-Spec NUR (M-Spec). Franz conveyed the V-Spec would cost Chowdhry about $290,000, whereas the M-Spec would cost about $350,000. Not wanting to spend over $300,000, Chowdhry said the latter was "out of the question" and asked Franz to proceed with looking for the former.

Franz and Chowdhry exchanged text messages over the course of a couple of weeks. At one point, Chowdhry asked, "You guys get the car?" Franz responded, "Yes, we secured it. [¶] It is ours. [¶] I need to get this side secured so I can go pick up the car and docs. [¶] Then I will go get it de-registered and ready for air or ocean shipment. [¶] Working on your parts now." Chowdhry understood this to mean the V-Spec was in their possession and ready for him to purchase for $280,000, a price they had agreed upon. Franz followed up by emailing him a Phase9 purchase agreement identifying that car and price, as well as a vehicle history report for it, and asked him to read the agreement, countersign, and send it back. Chowdhry did so.

Included in the purchase agreement was a provision indicating Phase9 would provide Chowdhry with certain documents, including a CBP 7501 federal customs form (CBP 7501). Chowdhry said his understanding was that a blue seal stamped CBP 7501 was necessary to register the imported vehicle for legal operation on streets.

After Chowdhry transferred the $280,000 to a Phase9 bank account, Franz informed him the V-Spec seller had a change of heart and was no longer selling it. He further stated he could not provide Chowdhry a refund because Chowdhry's money had already been transferred to Japan, but the amount could be applied as credit toward purchase of another vehicle.

4

Franz offered to source an M-Spec, the type of car he originally mentioned as an alternative to the V-Spec. Chowdhry did not sign another agreement, but instead "took [Franz's] promises as fact" and followed Franz's direction to "'ignore the last contract.'"

Four days after the initial money transfer, Chowdhry transferred to Phase9 an additional $100,000. That money accounted for the increased purchase price of the agreed upon 2002 M-Spec—$350,000 total—and $30,000 in upgrades Chowdhry requested to enhance the driving experience. Chowdhry sent Franz a text message expressing his excitement and gratitude: "'Thank you for making it happen. Phase9 will be a living legend in the U.S. and this car will be driven.'" Franz responded with a heart emoji.

Franz prepared and had Chowdhry review and sign a variety of documents. Chowdhry understood the documents to be those necessary to get approvals from relevant government agencies so he could register the car and drive it on public streets. In preparation for receiving the car, Chowdhry obtained insurance allowing it to be driven up to 2,500 miles annually.

At one point, Chowdhry received an email from a person at the National Highway Traffic and Safety Administration (NHTSA) who was working on his documents. The email "remind[ed]" him "that [the M-Spec] cannot be used on public roads and cannot be registered." It further conveyed state departments of motor vehicles would "be notified not to register [it] for on road use." Chowdhry asked Franz about the email and Franz told him not to worry about it because they had specifically checked a box on their application that it was for on road use and the federal government could not govern state departments of motor vehicles.

After the car was imported, but before Chowdhry received it, Franz emailed Chowdhry a Phase9 "final delivery invoice" with

5

approximately $51,000 in additional amounts due. The additional amounts, most of which Chowdhry said he had not previously heard about, included a $17,400 freight charge, a $2,000 container booking premium, roughly $2,500 in terminal handling charges, and an $8,750 federal customs fee. Based on conversations with Franz and Frederick, Chowdhry understood the latter to be a standard 2.5 percent of the purchase price of the car. Chowdhry was frustrated to learn of the additional charges but paid them. He later received the federal customs entry form for the M-Spec which listed its value at $15,602 and indicated Phase9 only paid a $390 federal customs fee.

When Chowdhry finally received the car, Franz let him use Phase9 dealer plates once or twice so Chowdhry could drive it while waiting for the documents necessary to register it. Over the course of the next few months, Chowdhry checked in with Franz from time-to-time to find out the status of receiving the documents. Franz reassured him multiple times they would be forthcoming, including a blue seal stamped CBP 7501. When asked about Frederick's involvement in the transaction, Chowdhry testified Frederick "was present at most of the interactions" with Franz, and Frederick "re-enforced [*sic*] everything that ended up being false."

Chowdhry unsuccessfully tried reaching out to the Phase9 importer for additional information on the status of documents. He later learned Franz told the importer: "Please don't give him any info for anything regarding this vehicle we imported for him. He was a total asshole yesterday by cursing and yelling at me when my mom was on the phone. He further alleges that I failed to obtain the blue seal [stamped CBP 7501] for his car and that I'm not doing anything about it[,] along with threats and defaming business online if he doesn't get it. Had to remind him that his vehicle cannot be registered legally . . . . Guy thinks he can throw money at any problem to

make it go away. [¶] Anyways, just wanted to give you a heads up if he tries to call you. Tell him to talk to Franz and that there is nothing you can legally give to him since we imported it for him. That will screw with him!" Chowdhry testified that all the accusations Franz made to the importer about him were false.

With four months having passed since receiving the car, Chowdhry still had not received the promised documents. He later learned that around this time, Franz sent an email to persons handling the matter at the U.S. Environmental Protection Agency and the NHTSA. The email, labeled by Franz as confidential, conveyed that although Phase9 had imported the car for show and display purposes, it had become "apparent recently that [Chowdhry] ha[d] been trying to obtain the blue DHS seal on the CBP 7501 for the purpose of registering his vehicle in Montana for as [*sic*] his daily driver. . . . [H]e is using it as his favorite daily driver vehicle. He was also seen using California [d]ealer plates . . . as you can see in the image below." He closed the email with: "I sincerely appreciate you to please keep this information I am providing confidential as [Chowdhry] is known to be violent and lawsuit happy." Chowdhry denied ever being violent or being involved in a lawsuit prior to this case. He further testified Franz was the one who told him how to get the vehicle registered in Montana, but he never tried to do so.

After still not receiving the blue seal stamped CBP 7501 by roughly a year and a half after receiving the car, Chowdhry paid another company to export the car and reimport it so that he could receive the documentation needed to register it for driving purposes. The process was complete and Chowdhry was finally able to drive the car legally on public streets twenty-one months after originally receiving it.

7

## B. *Franz's Testimony*

Franz testified he created Phase9 in 2015 to focus on the sourcing, procurement, and importation of Japanese domestic market vehicles that are 25 years or older. He always had 100 percent ownership of the company and acted as its chief executive officer. At the time of the events giving rise to the dispute with Chowdhry, his brother, Frederick, was chief operating officer, and his sister, Chisholm, was chief financial officer. Franz said neither was paid by Phase9, but he would allow them to seek reimbursement from Phase9 for things that were for the company's benefit.

Regarding the V-Spec, Franz said the seller backed out of the sale after Phase9 transferred Chowdhry's money to the company handling things for them in Japan. He said he offered to refund Chowdhry his money, but the offer was not done by text message, email, or other written communication. Chowdhry declined the refund because he had cashed out crypto currency to get the money and already paid some taxes on it.

As for the M-Spec, Franz said Chowdhry knew the federal government's conditions relating to the temporary exclusion under which they imported the car and he signed a letter submitted to the NHTSA which indicated the car would "not be driven on public streets and [would] only be trailered and/or towed to and from shows where [he would] display [it] to the public." However, according to Franz, Chowdhry "wanted to use [Phase9's] dealer plates and circumvent the law." He "was trying to hide from paying taxes and he did not want to register it in California."

Franz also explained he continuously worked to get the blue seal stamped CBP 7501 because Chowdhry wanted it, but "it just took time" because "the federal government works extremely slow." He said he finally obtained the document 11 days after Chowdhry filed suit and provided it to

8

his own legal counsel. Franz acknowledged his legal counsel turned it over to Chowdhry's legal counsel roughly one year later.

## C. Frederick's Testimony

Frederick explained his role in Phase9 as "just helping [his] brother out." Although Franz gave him the chief operating officer title, his day-to-day focused on picking up imported cars from the port, transporting them to get detailed, and delivering them to clients. Frederick was not paid a salary; rather, Franz would help him whenever he needed something. He acknowledged Franz, through Phase9, helped him pay "little bill[s]" and for gas. He also confirmed Phase9 purchased over $100,000 of jewelry—watches, a necklace, a bracelet, and earrings—which, according to him, he and Franz wore as Phase9 "conversation starters." When asked about other expenses paid by Phase9, including a trip to Hawaii, Frederick denied any knowledge and said Franz handles the bank statements and payments. He later admitted Phase9 paid the credit card bills for an account in his name that was used to purchase designer shoes, resort dinners in Hawaii, and gifts for his ex-girlfriend. He also confirmed the validity of Franz's testimony that the cars he and Franz drove daily, for business and pleasure, were Phase9 purchased or leased "dealer cars," such as a $371,000 McLaren, a $430,000 Ferrari, and matching Mercedes Benz AMGs.

Although Frederick first disclaimed being part of the transaction with Chowdhry, he later admitted to providing Chowdhry with a list of additional parts Phase9 could sell him to enhance the M-Spec and to picking up the Phase9 dealer plates Chowdhry used.

## D. Chisholm's Testimony

Chisholm described her role with Phase9 as "just show[ing] up [to the office] when [Franz] need[ed] her to pay a bill and that's about it." She

9

acknowledged Franz designated her as chief financial officer, but said it was just a title and Franz "did everything." Additionally, she denied having met Chowdhry or playing any role in the relevant transaction.

Although she had access to the Phase9 financial accounts, Chisholm said she never looked at them. Regarding expenses paid by Phase9, she confirmed Phase9 paid mortgage payments for her house, as well as electricity bills, during a certain time period Phase9 vehicles were stored there. She also confirmed the vehicle she drove daily was a Phase9 owned Mercedes Benz AMG.

## III.

### JURY INSTRUCTIONS

Regarding damages, the court instructed the jury with, inter alia, modified versions of CACI Nos. 3900, 3934, and 3947.

CACI No. 3900 included a list of the specific damages being claimed by Chowdhry. In addition to punitive damages, they included: $130,000 to $170,000 for the difference between the actual fair market value of the M-Spec and Chowdhry's $350,000 payment for it based on defendants' false overvaluation of it; $61,318.01 for fees paid by Chowdhry "that were fabricated or otherwise unnecessary"; $32,601.00 incurred to legally export and reimport the car so it could be legally registered for operation; $168,000 for loss of use; and $15,861 for insurance premiums paid when Chowdhry was unable to drive the car on public roads.

CACI No. 3934 instructed that although Chowdhry sought damages from each of the defendants under more than one legal theory, "each item of damages may be awarded only once, regardless of the number of legal theories alleged." It then listed the legal theories under which the jury would "be asked to decide whether each of [the] [d]efendants are liable." The

10

instruction also specified the types of damages, including punitive damages, reiterating each item of damages was "recoverable only once."

CACI No. 3947, which concerned punitive damages, instructed that if the jury found "[d]efendants' conduct caused [Chowdhry] harm, [it] must decide whether that conduct justifies an award of punitive damages."[3] The instruction specified the requisite clear and convincing malice, oppression, or fraud finding, and it defined each term. Additionally, it listed various factors the jury should consider in determining the proper amount of punitive damages, including defendants' financial condition.

IV.

SPECIAL VERDICT FORM AND JURY VERDICT

The jury rendered a verdict largely in Chowdhry's favor, completing a 16-page special verdict form drafted and agreed to by the parties. The verdict form separated out the causes of action and asked between two and six yes/no questions regarding each. None of the questions concerning actions by defendants required a separate answer as to each defendant. Instead, they asked whether any of the defendants did a certain act. For example, the first fraud cause of action question asked: "Did any of Defendants Franz Gerald Andre Tissera a/k/a Franz Tissera, Phase9motorsports, Inc., and/or Frederick Tissera make a promise to Plaintiff Usman Chowdhry?" If the jury answered "yes" to each question posed for a particular cause of action, the verdict form instructed the jury to

_____

[3] Defendants claim the court instructed the jury with a version of CACI No. 3940 that specified it could "'award punitive damages only if [it] also award[ed] [Chowdhry] actual damages.'" The record citations provided do not correspond to any such instruction, and we have not found any such instruction in the record.

11

"answer the questions in the verdict form titled 'DAMAGES ON MULTIPLE LEGAL THEORIES'" after completing all other parts of the form.

The "Damages on Multiple Legal Theories" section of the verdict form grouped damages as to each defendant separately. Below each defendant's name was a list of the types of damages sought (reliance, consequential, loss of use, civil penalties, and punitive damages), with blanks for the jury to fill in amounts. Before the blank for punitive damages was the following additional question: "Did [specified defendant] engage in the conduct with malice, oppression, or fraud?"

The jury answered most cause of action specific questions "yes." The "no" answers were in response to a conversion related question regarding whether defendants knowingly and intentionally refused to return Chowdhry's money and four CLRA questions concerning whether any of the defendants made specified representations to Chowdhry. The latter "no" responses concerned the following representations: "Falsely state to Mr. Chowdhry that they had secured for his purchase a 1999 Nissan Skyline for $280,000.00 in order to induce him into wiring these funds to them when in fact they knew that they had not secured this vehicle when the statement was made"; "Falsely state to Mr. Chowdhry that the 2002 Nissan Skyline's fair market value was $350,000.00"; "Falsely state to Mr. Chowdhry to pay for fees identified in invoices when in fact those fees were either fabricated or unreasonable"; and, "Falsely state that the 2002 Nissan Skyline M-Spec Nur that Mr. Chowdhry would purchase could be registered to be driven within the United States upon receipt by Mr. Chowdhry."

On the damages pages of the verdict form, the jury listed "0.00" in each blank for Frederick and answered negatively the question concerning whether he acted with malice, oppression, or fraud. The outcome was

12

different for the other two defendants. For Franz, the jury wrote "0.00" for reliance, consequential, and loss of use damages, as well as civil penalties. However, after answering that Franz "engage[d] in the conduct with malice, oppression, or fraud," it specified $100,000 in punitive damages. For Phase9, the jury listed "0.00" in reliance damages, $38,143 in consequential damages, $80,000 in loss of use damages, and $75,000 in civil penalties. It also found Phase9 "engage[d] in the conduct with malice, oppression, or fraud," and specified $50,000 in punitive damages.

After the jury verdict was read, the trial court polled the jury at the request of Chowdhry's counsel. A few jurors said they voted contrary to the jury's ultimate verdict on a couple of the questions. However, all jurors confirmed voting consistent with the damages portion of the verdict. Following polling, the court excused the jury.

V.

POST-VERDICT PROCEEDINGS AND JUDGMENT

Immediately following the jury's excusal, the trial court turned to an alter ego issue the parties left to the court's discretion. It heard argument from both sides concerning whether Franz or Frederick was an alter ego of Phase9. In urging the court to make an alter ego finding as to both, Chowdhry's counsel highlighted the family nature of the business, Frederick's testimony that he was a co-owner of Phase9 at one point, the personal expenditures paid by Phase9, and the lack of certain corporate formalities during the time Chowdhry was dealing with Phase9. Defendants' counsel argued there was no evidence of undercapitalization, lack of all corporate formalities, or comingling of funds. Ultimately, the court found Franz and Frederick to each be the alter ego of Phase9. Neither side requested a written decision on the issue, but orally the court emphasized how evidence showed

13

the brothers' households were "essentially . . . running through the Phase9[] [bank] account."

The trial court entered judgment, incorporating the jury verdict and the alter ego findings. The judgment further specified Chowdhry was to "recover the sum of $341,143.00 from [Franz] with post-judgment interest thereon at ten percent . . . per annum until paid," and to "recover . . . the sum of $243,143.00 from [Frederick and Phase9] and each of them, jointly and severally with post-judgment interest thereon at ten percent . . . per annum until paid."

After Chowdhry served a notice of entry of judgment, defendants moved for a judgment notwithstanding the verdict (JNOV) and a new trial. The JNOV motion argued the punitive damages needed to be stricken from the judgment because there was "no evidence of defendants' wealth introduced [at trial]." Defendants raised the same argument in their new trial motion. Additionally, they contended a new trial was required because the jury's verdict was inconsistent. On one hand, the jury awarded no compensatory damages vis-à-vis Franz, but on the other hand, it awarded $100,000 in punitive damages against him. From their perspective the latter, as a matter of law, could not stand without some amount for the former.

Chowdhry opposed the motions. He argued defendants waived their arguments about the alleged defective nature of the jury verdict by failing to raise them before the jury was discharged. In addition, among other arguments, he asserted there was ample evidence of defendants' wealth and the alter ego finding making Franz responsible for the damages against Phase9 was sufficient to support the punitive damages against him.

14

The court heard argument from the parties,[4] took the matters under submission, and later issued an order denying both motions. As to the JNOV motion, the court said its alter ego finding as to Franz made all liability and damages findings as to Phase9 applicable, jointly and severally, to Franz. Regarding the new trial motion, the court noted "[d]efendants failed to object to the jury verdict form at trial and prior to the discharge of the jury." It also found "there was ample admissible evidence presented to the jury to establish [d]efendants['] financial condition."

Defendants timely appealed.

DISCUSSION

Defendants contend the trial court erred in denying their JNOV and new trial motions for three reasons.[5]  First, they argue the damages portion of the jury's verdict is against the law because the jury awarded $100,000 in punitive damages against Franz but no compensatory damages against him. Second, they assert there is insufficient evidence to support any of the punitive damages awarded. Third, they claim the court's alter ego finding is not supported by substantial evidence. While defendants forfeited the first argument and waived the third, we conclude the second argument has merit and requires reversal of the punitive damages portions of the judgment.

---

[4] There is no transcript of this hearing in the appellate record.

[5] Defendants' opening brief also argued the following as grounds for a new trial: juror misconduct, prejudicial evidentiary rulings, and erroneous and misleading jury instructions. After Chowdhry's brief accurately identified that none of those arguments were supported by valid citations to the record identifying the improper matters, defendants stated in their reply brief that they never made the arguments in the first instance. We treat defendants' response as a concession that the arguments lacked merit.

15

I.

FORFEITURE

Defendants contend the $100,000 punitive damage award against Franz, as an individual, cannot stand because the jury awarded no compensatory damages against him. (See *Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147 [actual damages, even if nominal, are "absolute predicate" for punitive damages award], overruled on other grounds in *Los Angeles Unified School Dist. v. Superior Court* (2023) 14 Cal.5th 758, 775.) Defendants raised this issue below, but it is undisputed they did not do so until they moved for a new trial. Chowdhry contends they forfeited their challenge to the verdict on this ground by failing to bring it to the court's attention before the jury was discharged.

Although defendants frame the issue as one involving an illegal verdict, they do so by unwarrantedly viewing the jury's answers to a few questions in isolation. Properly considering the special verdict as a whole, and construing it with reference to other parts of the record, shows the verdict was ambiguous in such a manner that required defendants to bring concerns to the trial court's attention prior to the jury's discharge. Having failed to do so, they forfeited their argument grounded in the absence of a compensatory damage award against Franz.

*A. Applicable Law*

"The forfeiture rule generally applies in all civil and criminal proceedings. [Citation.] The rule is designed to advance efficiency and deter gamesmanship." (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264 (*Keener*).) In the special verdict context, the line between forfeiture and preservation hinges on the type of alleged defect.

16

Generally, "if the alleged defect was apparent at the time the verdict was rendered and could have been corrected" had the issue been brought to the trial court's attention, then "failure to object to [it] before the discharge of [the] jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict." (*Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 521, fn. omitted; accord *Keener, supra*, 46 Cal.4th at p. 265.) "The requirement of an objection is premised upon the idea that a party should not sit on [their] hands, but instead must speak up and provide the court with an opportunity to address the alleged error at a time when it might be fixed." (*Keener*, at p. 266.) These principles apply when a verdict is incomplete or ambiguous. (See *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092, fn. 5.)

"In contrast, if the special verdict[] [is] "'hopelessly ambiguous'" or inconsistent, failure to seek clarification from the jury does not create a forfeiture." (*Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 300.) In such a situation, "the proper remedy is ordinarily a retrial on the issues underlying the defective verdict" (*ibid.)* because a court "is not permitted to choose between inconsistent answers." (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682; see also *Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 721 ["'Inconsistent verdicts are "'against the law,'" and the proper remedy is a new trial"].) "'A special verdict is inconsistent if there is no possibility of reconciling its findings with each other.'" (*King v. State of California* (2015) 242 Cal.App.4th 265, 296.) Stated differently, it is one in which the express or implicit findings are internally inconsistent. (*Keener, supra*, 46 Cal.4th at p. 268, fn. 27; see, e.g., *Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 970 [internal inconsistency in verdict where one response necessarily implied

17

defendant was negligent and another response necessarily implied defendant was not negligent].)

*B. Analysis*

Because the forfeiture issue hinges on whether the verdict is more properly characterized as ambiguous or as inconsistent, we first turn to that question.

On appeal, we review a special verdict de novo to determine whether its findings are ambiguous or inconsistent. (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358.) "Generally, "'[a] verdict should be interpreted so as to uphold it and to give it the effect intended by the jury, as well as one consistent with the law and the evidence.'"" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 877.) In construing a special verdict, we review the jury's answers in the context of the pleadings, the evidence, and the jury instructions. (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456.)

Here, the evidence demonstrated that the only two people on whose acts Phase9's liability could be based were Franz and Frederick. Each act they were alleged to have done, and each act the evidence showed they did, was an act on behalf of Phase9. It is clear from the jury's answers to the punitive damage related questions about acting with fraud, oppression, or malice, that it found at least some of Franz's conduct to be a basis for liability. However, because the verdict form grouped all the defendants together in the legal theory specific questions, the verdict is ambiguous as to whether the jury also found some of Frederick's acts to provide such a basis.

The ambiguity in whose actions form the basis for liability gives way and adds to an ambiguity in the compensatory damages portion of the

18

verdict. The jury was instructed each item of compensatory damages could be "awarded only once" and was "recoverable only once." With the only compensatory damages awarded being against Phase9, it is ambiguous whether that resulted from the jury's misunderstanding of the "awarded only once" and "recoverable only once" instruction as directing it could only list compensatory damages as to one defendant, or whether it was based on, for example, a finding that Franz and/or Frederick did not cause Chowdhry harm. If the former, the jury could have been reinstructed with the same or a clarified instruction and told to deliberate further. If the latter, defendants may have had grounds for a new trial based on inconsistent factual findings and an illegal punitive damages verdict against Franz. But because the ambiguities in the verdict were not raised before the court excused the jury, there was no chance to get clarification.

Because the validity of the punitive damages award against Franz could have been impacted by a resolution of the identified verdict ambiguities which were apparent at the time the verdict was rendered, defendants were precluded from challenging the punitive damages award for the first time in a new trial motion. They likewise forfeited the issue for purposes of appeal.[6]

## II.

### SUFFICIENCY OF EVIDENCE TO SUPPORT PUNITIVE DAMAGE AWARDS

As raised in both their JNOV and new trial motions, defendants contend there is insufficient evidence to support any award of punitive

---

[6] The same is true regarding defendants' arguments that the punitive damage award against Franz violates due process ratio limitations between compensatory and punitive damages, and that the lack of a compensatory damage award against Franz negated an essential element of the fraud cause of action.

damages to Chowdhry because there was "a lack of meaningful evidence of . . . defendants' current financial condition." We agree.

"An award of punitive damages hinges on three factors: the reprehensibility of the defendant's conduct; the reasonableness of the relationship between the award and the plaintiff's harm; and, in view of the defendant's financial condition, the amount necessary to punish [them] and discourage future wrongful conduct." (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 914 (*Kelly*).) Regarding the latter, the Supreme Court long ago held that a plaintiff seeking punitive damages has the burden of introducing evidence of the defendant's financial condition at the time of trial. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109.) Although the high court declined to prescribe a rigid standard for measuring a defendant's financial condition (*id.* at p. 116, fn. 7), subsequent case law demonstrates something more than evidence of income and assets is required. (See *Farmers & Merchants Trust Co. v. Vanetik* (2019) 33 Cal.App.5th 638, 648 (*Farmers*); *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 676; *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1063–1065.) Even if significant in value, income and assets are only one part of the financial equation; they do not speak to whether, and to what extent, liabilities and debts exist. (See *Farmers*, at pp. 649–650; *Kelly*, at pp. 916–917.)

Here, there was evidence of some assets—e.g., very high-end vehicles and expensive jewelry. The was also testimony from Franz about a six-figure money transfer from a Japanese bank account he had which helped effectuate the vehicle purchase for Chowdhry, with clarification that the transfer was not directly from money transferred to Phase9 by Chowdhry. And, Chowdhry introduced more than 100 pages of Phase9 bank account

statements, dated between January 2021 and November 2022, relating to a checking account closed before the time of trial.

Such limited evidence was insufficient to understand even the complete income and asset side of Phase9 or Franz, as an individual, at the time of trial. Additionally, there was no evidence of the other side of the balance sheet for either of them. The absence means there was insufficient evidence concerning either's financial condition.

Because Chowdhry had a full and fair opportunity to present evidence establishing his entitlement to punitive damages, but he failed to do so, a retrial on the issue of those damages is unwarranted. (*Kelly, supra*, 145 Cal.App.4th at p. 919; *Farmers, supra*, 33 Cal.App.5th at p. 650). Rather, the appropriate remedy is to reverse the punitive damages awards so they may be stricken from the judgment. (*Kelly*, at p. 919.)

III.

ALTER EGO

Defendants' last contention is that the trial court's alter ego determination is not supported by sufficient evidence. They urge us to provide two forms of relief. One, they ask we vacate the portion of the judgment holding the individual defendants personally liable for the damage award against Phase9. Two, they assert this is "an additional, independent ground requiring a new trial on liability." We find defendants waived the claimed error and, even absent such waiver, would find no error in the court's alter ego determination.

A. Applicable Law

"Alter ego is essentially a theory of *vicarious* liability under which the owners of a corporation may be held liable for harm for which the corporation is responsible where, because of the corporation's utilization of

21

the corporate form, the party harmed will not be adequately compensated for its damages." (*Doney v. TRW, Inc.* (1995) 33 Cal.App.4th 245, 249.) There is "no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 (*Mesler*).) However, the two general requirements for an alter ego finding are: "'(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.'" (*Ibid.*)

"The factors which may show the 'unity of interest' issue vary according to each case and are fact specific. [Citation.] Among the facts which can be considered are financial issues (e.g., was the corporation adequately capitalized?); corporate formality questions (e.g., was stock issued, are minutes kept and officers and directors elected, are corporate records segregated?); ownership issues (e.g., what is the stock ownership picture?); commingling issues (e.g., are corporate assets commingled, does the parent company merely use the corporate shell of the subsidiary to obtain goods and services for the parent company?); etc." (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1285, fn. 13, citing *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825.) "'"No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine."'" (*Greenspan v. LADT, Inc.* (2010) 191 Cal.App.4th 486, 513.)

As to the inequitable result requirement, "[t]he essence of the alter ego doctrine is that justice be done. 'What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate

22

entity, is that liability is imposed to reach an equitable result.' [Citation.] Thus, the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." (*Mesler, supra,* 39 Cal.3d at p. 301; see *Las Palmas Associates v. Las Palmas Center Associates* (1992) 235 Cal.App.3d 1220, 1249 ["Because society recognizes the benefits of allowing persons and organizations to limit their business risks through incorporation, sound public policy dictates that imposition of alter ego liability be approached with caution"].) "The alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539.)

*B. Analysis*

"'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."'" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) In addition, "[a] party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable." (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) Failing to do so results in the issue being waived. (*Ibid.*)

Defendants violate both of these well-established appellate principles. They do not cite and discuss the evidence bearing on the alter ego issue. Similarly, they do not provide legal authority supporting their argument, discuss the various alter ego "unity of interest" factors, or explain why there was insufficient evidence demonstrating an inequitable result

23

would follow if Phase9's corporate form was respected. Accordingly, their argument is waived.

Even if we were to reach the merits, defendants' argument fails because substantial evidence supports the trial court's alter ego determination. The parties agreed the evidence presented to the jury would be the evidence on which the court would make its ruling. That evidence included testimony that: Phase9 was a family business with no employees and no physical office; Frederick and Chisholm held C-level titles, but were not paid a salary or other compensation by Phase9; Franz exercised full control over Phase9 and its activities, including those vis-à-vis Chowdhry; Frederick was always present and agreeing with Franz when Franz spoke with Chowdhry, and Franz copied Frederick on related email communications; and, money from a Phase9 bank account was used to pay for valuable jewelry purchased and worn by Franz and Frederick, multiple high-end vehicles driven day-to-day by Franz and Frederick, a Hawaiian vacation, Chisholm's personal home mortgage and utility bills, Frederick's personal credit card bills, and gifts for Frederick's ex-girlfriend.

The extensive use of corporate funds for personal assets and debts, along with complete family ownership and a lack of standard corporate formality and structure, is sufficient to demonstrate the requisite unity of interest. Additionally, given this context, and with Franz and/or Frederick having performed all the acts on which liability was ultimately based, there was sufficient evidence for the trial court to conclude that treating the acts as those of the corporation alone would "'produce an unjust or inequitable result.'" (*JPV I L.P. v. Koetting* (2023) 88 Cal.App.5th 172, 200.)

24

## DISPOSITION

The judgment is reversed insofar as all the punitive damages awards are concerned. In all other respects, the judgment is affirmed. In the interests of justice, the parties shall bear their own costs on appeal.


DELANEY, J.


WE CONCUR:


SANCHEZ, ACTING P. J.


GOODING, J.